No. 54,048

CIRCLE LAND AND CATTLE CORPORATION, *et al., Plaintiffs/Appellees,* v. AMOCO OIL COMPANY, *Defendant/Appellant,* and INTERNATIONAL HARVESTER COMPANY, *Defendant/Appellant.*

(657 P.2d 532)

Opinion filed January 14, 1983.

*Lelyn J. Braun,* of Lelyn J. Braun, Chartered, of Garden City, argued the cause, and *James M. Concannon,* of Topeka, was with him on the brief for the appellant Amoco Oil Company.

*E. Edward Brown,* of Calihan, Brown, Osborn & Burgardt, of Garden City, argued the cause and was on the brief for the appellant International Harvester Company.

*Charles E. Owen, II,* of Owen & Vieux, of Garden City, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

PRAGER, J.: This is an appeal by the defendants from a jury verdict finding them liable to the plaintiffs for damage caused to plaintiffs' irrigation engines as a result of the use of an improper engine oil. The plaintiffs are Circle Land and Cattle Corporation, Dean Gigot, and other individual members of the Gigot family, who are engaged in carrying on an extensive irrigation farming and cattle operation in Finney County. The plaintiffs are the owners of 160 International Harvester irrigation engines which are used in their business. Defendant Amoco Oil Company is a manufacturer and seller of oil products, including a product known as Amogas Ashless engine oil. Defendant International Harvester Company manufactures, sells, and services irrigation engines among other products.

The facts in the case are not greatly in dispute and essentially are as follows: Plaintiff, Dean Gigot, who is the president of Circle Land and Cattle Corporation, is a farm expert with wide experience in the operation of irrigation engines. He is the principal person who acted on behalf of the other plaintiffs in this case. During the 1977 irrigation season, plaintiffs incurred problems with the valves in their numerous irrigation engines which necessitated extra maintenance. In response to this problem, Dean Gigot contacted International Harvester and was informed, in substance, that International Harvester would not discuss the matter unless Gigot was using an ashless or low-ash oil that conformed with International Harvester's recommended specifications.

Thereafter, Dean Gigot contacted Bud Hebrlee, a dealer jobber for defendant Amoco Oil Company, and told Hebrlee that he needed a recommendation for oil for the 160 Model 549 irrigation engines that plaintiffs were operating. Hebrlee advised Gigot that he did not know the proper oil and suggested that they call an expert at Amoco who had a large library and could provide the proper recommendation for the oil. Hebrlee then placed a telephone call to Don Means, a product recommender for Amoco. According to the testimony of Hebrlee and Gigot, Hebrlee advised Means as to the type of engines the oil was to be used in and asked Means for a recommendation. Means made a recommendation and forwarded to Hebrlee a certain pamphlet published by Amoco recommending Amogas Ashless engine oil for use in engines of the same type as plaintiffs' engines. Dean Gigot testified that, in his telephone conversation with Don Means, he told Means that it had been suggested that he go to a lower ash oil for his engines and asked the specific question, "Do you have a low ash oil that will fit the bill, fit the needs of this International Harvester irrigation engine." Means advised him that they had Amogas Ashless which would be an excellent oil for Gigot's engines. Means testified by deposition that he could have had such a conversation but that he had no actual memory of this particular conversation and could neither confirm nor deny the accuracy of the testimony of Hebrlee and Gigot. Means further testified that he had no reason to dispute the testimony of either Hebrlee or Gigot.

It is undisputed that the Amoco pamphlet on the qualities of

Amogas Ashless oil was delivered by Means to Hebrlee and by Hebrlee to Gigot and that, thereafter, Gigot decided to use Amogas Ashless oil in plaintiffs' irrigation engines and ordered a large quantity of the oil which was subsequently used during the 1978 season. It is undisputed that damage resulted to the engines as a result of the use of this oil. Defendant Amoco admitted at the trial that Amogas Ashless was not the recommended oil for the irrigation engines involved, that it was not fit for use in plaintiffs' engines, and that it caused some of the damage to the engines. Gigot testified that he relied on Means's recommendation in purchasing and using the Amogas Ashless. There was no evidence introduced by Amoco to the contrary.

In June 1978, International Harvester arrived on the scene. In that month, Joe Arwine, the branch manager of International Harvester's local distributorship, was requested by his superiors to go the plaintiffs' farm to discuss a surveillance program on certain irrigation engines. During that discussion, Arwine was advised by plaintiffs that there had been some premature failures on some of their engines due to improper oil usage. It is important to note that Arwine was directed by his superiors to be sure that the oil used by plaintiffs met the specifications because there had been difficulties with camshaft failures in the past. Arwine testified that he definitely wanted to make sure the oil met the specifications at the time he visited the Gigot farms. As a result of the conversation between Arwine and Gigot, a surveillance program was developed and implemented by International Harvester.

In accordance with the program, samples of engine oil were periodically drawn from plaintiffs' engines by plaintiffs' employees and forwarded to an International Harvester laboratory for analysis. The first oil samples were turned in on June 19, 1978, and analyzed at the laboratory on about July 5. Thereafter, further oil samples were drawn and analyzed at various times throughout the irrigation season. The results of the oil analyses were forwarded to International Harvester and the local dealer assisting International Harvester in the program. Generally, these various reports indicated that the oil was normal and suitable for further use in plaintiffs' engines. There was testimony that plaintiffs and their employees relied, at least in part, on these reports furnished by International Harvester. Unfortunately,

trouble developed. By mid-summer of 1978, camshaft failures in the irrigation engines were encountered. In late August, Donald Saylor, an employee of International Harvester, during a scheduled inspection of the program's engines, discovered compression loss. Saylor returned to Chicago where he discussed the problem with International Harvester's lubrication engineer, who ascertained that the trouble was oil related. For the first time it was discovered that Amogas Ashless oil did not meet the lubrication specifications for plaintiffs' engines. Saylor immediately notified plaintiffs that Amogas Ashless oil was not the oil to be used and further problems would persist if the oil was used. At that time, there were only a few days left in the irrigation season. It was impossible for plaintiffs to change all of the oil in their engines in that short a time, so the engines continued to operate for about a week. At the end of the season, it was necessary to repair all of plaintiffs' irrigation engines, resulting in expense in the neighborhood of $160,000. Plaintiffs made demand on defendants for reimbursement. These demands were not met by the defendants, and this litigation resulted.

Prior to the jury trial, plaintiffs filed a motion for summary judgment against Amoco Oil Company on the issue of liability. In addition, Bud Hebrlee, who was an original defendant in the case, filed a motion for summary judgment in his favor. Based upon the undisputed evidence as shown in the depositions, the trial court granted plaintiffs' motion for summary judgment and found that Amoco was, at least in part, liable to plaintiffs for any damage to their engines resulting from the use of Amogas Ashless. The percentage of causal fault and the extent of the damages was to be determined at the time of the trial. The trial court also sustained the motion for summary judgment filed by Bud Hebrlee, holding that, under the undisputed testimony as disclosed in the discovery depositions, Hebrlee, when asked by Gigot for advice concerning the proper lubrication of plaintiffs' engines, disclaimed any knowledge or expertise in the area and simply referred Gigot to Don Means for advice. The court further found that Gigot did not rely on any advice of Bud Hebrlee.

The case then proceeded to trial by jury with Amoco Oil and International Harvester as the two defendants in the case. The case was tried on the basis of comparative fault. Each defendant pointed the finger of responsibility at the other and at the plain-

tiffs. The jury, in its special verdict, found that the damage incurred to plaintiffs' engines was 60% the fault of Amoco Oil Company, 30% the fault of International Harvester, and 10% the fault of the plaintiffs. The jury found the total damages suffered by plaintiffs to be in the amount of $160,000. The trial court entered judgment on the verdict and Amoco Oil and International Harvester appealed.

We will first consider the appeal of defendant Amoco Oil Company. Amoco first contends that plaintiffs were not entitled to summary judgment on the issue of liability as against Amoco. We find no merit to this contention. The theory of liability asserted by plaintiffs against defendant Amoco was for breach of an implied warranty of fitness for a particular purpose as provided by K.S.A. 84-2-315 which states as follows:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

As noted in the official UCC comment to 84-2-315, whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section, the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

Since the enactment of K.S.A. 84-2-315, liability has been imposed on a seller on the basis of a breach of an implied warranty of fitness for a particular purpose in *Christopher & Son v. Kansas Paint & Color Co.,* 215 Kan. 185, 523 P.2d 709 (1974), and, more recently, in *Addis v. Bernardin, Inc.,* 226 Kan. 241, 597 P.2d 250 (1979). We have no hesitancy whatsoever in holding, under the factual circumstances in this case, that defendant Amoco breached an implied warranty of fitness for a particular purpose; that plaintiffs, as buyers, relied on the seller's skill or judgment in selecting Amogas Ashless engine oil; and that the damage to plaintiffs' irrigation engines resulted from the use of the recommended oil. The evidence in the case pertaining to the

conversation between Dean Gigot and Don Means, as agent of Amoco, was undisputed. It was also undisputed that, following this conversation and the delivery of the pamphlet on Amogas Ashless provided by Amoco, Gigot purchased a sufficient quantity of Amogas Ashless for use in the plaintiffs' irrigation engines during the 1978 irrigation season. As noted heretofore, defendant Amoco stipulated that Amogas Ashless was not fit for use in plaintiffs' International Harvester engines. Nobody disputed the fact that it was the Amogas Ashless oil which caused the damage to the plaintiffs' engines. We thus find no error in the trial court's entry of summary judgment in favor of plaintiffs against Amoco on the issue of liability.

Amoco further complains that the trial court erred in granting defendant Hebrlee's motion for summary judgment prior to trial, thus preventing the jury from considering Hebrlee's comparative fault. We find no error in the trial court's ruling. The evidence was undisputed that Gigot called Hebrlee, Amoco's local distributor, who did not profess to have knowledge on the subject of Amogas Ashless oil. He simply telephoned Amoco's products recommender, Don Means, who was informed of plaintiffs' problem and who recommended Amogas Ashless oil. There was no evidence that Hebrlee took any action other than refer Gigot to Means. Gigot did not claim that he relied in any way on any recommendation made by Hebrlee. We find no error on this point.

Amoco next claims that the trial court's instructions were erroneous for the reason that they improperly led the jury to believe that Amoco must be held more at fault than International Harvester or plaintiffs. We have examined these instructions and have concluded that they properly set forth the contentions of the various parties and left it up to the jury to determine their comparative fault. We find no basis for a reversal on this point.

Amoco and International Harvester jointly contend that the trial court erred in refusing to reduce the maximum amount of plaintiffs' claimed recoverable damages from $170,000 to $154,546 to conform to the evidence presented by plaintiffs. At the trial, plaintiffs introduced a detailed summary of the cost of the repairs on 154 of its Model 549 irrigation engines. This summary reflects a total repair cost of the 154 engines to be the sum of $154,546. From a reading of the record in this case, we

have concluded that the defendants have not considered certain evidence presented by the plaintiffs which would have justified the jury in concluding that plaintiffs' damages amounted to $170,000. The 154 engines, damaged and repaired, for which specific invoices were produced, were not all of the engines damaged and repaired. Six additional engines were repaired during the irrigation season for which specific invoices could not be found. The damage to each individual engine was essentially the same and the average cost for repairing each engine was $978. Applying this average cost of repair to the six engines for which the specific invoices could not be found would amount to $5,868 which, added to the damages contained in the summary provided by plaintiffs, would total $160,415. In addition, plaintiffs' maintenance supervisor testified that plaintiffs were also required to return for overhaul and maintenance 40 additional engines in order to maintain their maintenance schedule. We have concluded that the evidence on damages offered by the plaintiffs could have sustained an award of $170,000, and that the jury's findings of damages in the total amount of $160,000 was proper.

We now turn to the points of claimed error asserted by International Harvester. International Harvester first maintains that the trial court erred in denying its motion for a directed verdict. At the outset, it should be pointed out that the plaintiffs' theory of liability asserted against International Harvester was based upon Restatement (Second) of Torts § 323 (1965), which provides as follows:

"§ 323. Negligent Performance of Undertaking to Render Services
"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
"(a) his failure to exercise such care increases the risk of such harm, or
"(b) the harm is suffered because of the other's reliance upon the undertaking."

Section 323 is based upon the legal principle that a valuable consideration is not a prerequisite to the existence of a duty to exercise due care. The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken, for nonperformance of which an action lies. See 57 Am. Jur. 2d, Negligence § 45, p. 392 and the many cases

cited therein. Stated in another way, where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking the act must generally be performed with ordinary or reasonable care. In 1928, Benjamin N. Cardozo, then Chief Judge of the Court of Appeals of New York, in *Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896 (1928), stated the rule in the following language:

" 'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all' [Citations omitted]. The plaintiff would bring its case within the orbit of that principle. The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all. . . ." p. 167.

In Kansas the rule was recognized in *Maddock v. Riggs,* 106 Kan. 808, 190 Pac. 12 (1920), where a defendant gratuitously accepted from the holder of a fraternal insurance policy one month's dues and undertook to remit the same to the fraternal association. He failed to remit the dues for one month, the result being that the insurance company was held not to be liable to the beneficiary named in the policy because of nonpayment of the premium. In a suit by the beneficiary, the defendant was held liable for failing to carry out his gratuitous undertaking. The principle of § 323 is also recognized in *Rowell v. City of Wichita,* 162 Kan. 294, 176 P.2d 590 (1947), where it is stated in Syllabus ¶ 3 as follows:

"If the circumstances are such that a person of ordinary common sense who thought about it would recognize at once that if he did not use ordinary care in his own conduct with regard to those circumstances, his act would place another in danger, the duty to use such ordinary care to avoid the danger arises."

More recently in *Schmeck v. City of Shawnee,* 232 Kan. 11, 24, 651 P.2d 585 (1982), this court recognized and applied § 324(A) of the Restatement (Second) of Torts, which states as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person under the undertaking."

In view of our cases which have followed the principle, we adopt Restatement (Second) of Torts § 323 as a correct statement of the law of this state and hold the rule of that section to be applicable to the case now before us, if there is evidence in the record to justify its application.

The thrust of International Harvester's argument is that it was a mere volunteer and entered upon this "oily scene" long after plaintiffs had already established a provable cause of action against defendant Amoco. It is argued that International Harvester simply solicited the assistance of plaintiffs in conducting a surveillance program on *six new engines* of plaintiffs, solely as a factfinding mission to assist International Harvester in obtaining information regarding engine problems that would normally occur during the warranty period. Samples of engine oil were drawn and analyzed by International Harvester simply as an adjunct to the surveillance program. International Harvester denies that it assumed any obligation to the plaintiffs or that it intended plaintiffs to rely on the laboratory oil analyses or that plaintiffs had any right to rely upon them. Stated simply, International Harvester argues that, as a mere volunteer, it had no legal duty to the plaintiffs and that the provisions of § 323 of the Restatement (Second) of Torts were not applicable.

The evidence presented in this case to support plaintiffs' claim for recovery under the above legal theory was substantially as follows: International Harvester approached the plaintiffs about monitoring the use of certain International Harvester engines. It injected its employees into plaintiffs' operation, professing to have an excellent oil analysis program. International Harvester sent its local agent, Joe Arwine, to the plaintiffs' farm to check whether the oil being used by plaintiffs met International Harvester's specifications. Arwine informed International Harvester that he had checked out the oil and it met the specifications required. Dean Gigot informed International Harvester's representative that the same oil was to be used in the Model 549 engines as well as in the new Model 605 engines. The series of oil analyses provided by International Harvester stated in substance that the oil samples examined were "O.K.," "normal," or "suitable for further use." Dean Gigot testified that, when the problems started, he did not look to the oil because International Harvester's reports said it was O.K. Plaintiffs did not question

use of the oil until International Harvester informed them at the end of the irrigation season that they were using the wrong oil. From this evidence, we have concluded that an issue of fact as to the application of § 323 of the Restatement was present to be determined by the jury from the evidence in the case. We hold that the trial court did not err in overruling International Harvester's motion for a directed verdict.

International Harvester next contends that there was insufficient competent evidence to support the jury finding that the plaintiffs used Amogas Ashless in reliance on the International Harvester reports or that such reliance was the cause of the damage to plaintiffs' Model 549 engines. We have summarized above the evidence of reliance presented to the jury and find it to be sufficient.

Finally, International Harvester maintains that the trial court in admitting into evidence, over objection, plaintiffs' Exhibits 9 through 14, which were the oil analysis reports prepared by International Harvester experts from an analysis of the oil used in the plaintiffs' engines. We note that these exhibits were admitted as a part of the deposition of Barry Rogers. Rogers identified these exhibits as being the oil analysis reports prepared by him for International Harvester. It is clear from the evidence that the oil analysis reports were prepared by International Harvester and that they were made available to the plaintiffs or their agents. The exhibits were relevant and were properly admitted.

The judgment of the district court is affirmed as to both defendants.