(901 P.2d 515)
No. 72,005█

DEBRA L. GIEGER-SCHORR, D.O., *Plaintiff/Appellant*, v. RON TODD, Administrator of the Kansas Health Care Stabilization Fund; *Defendant/Appellee*, DAVID R. GROSS and LUDIE GROSS, d/b/a GROSS INSURANCE AGENCY; *Defendants*, and KaMMCO, a/k/a KANSAS MEDICAL MUTUAL INSURANCE COMPANY, *Defendant/Appellee*.

Opinion filed March 17, 1995.

*Wm. Scott Hesse*, of Myers, Pottroff & Ball, of Manhattan, for appellant.

*Steve A. Schwarm* and *Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for appellees.

Before ELLIOTT, P.J., BRAZIL and LEWIS, JJ.

BRAZIL, J.: Dr. Debra Geiger-Schorr appeals the trial court's grant of summary judgment for Ron Todd, former commissioner of insurance and administrator of the Kansas Health Care Stabilization Fund (Fund) and KaMMCO, a/k/a Kansas Medical Mutual Insurance Company, and the court's denial of her motion for partial summary judgment. She argues that the trial court incorrectly interpreted K.S.A. 40-3402 and erred in holding that there was substantial compliance with the statute and there was no duty on the part of Todd or KaMMCO to inform Dr. Geiger-Schorr that she was eligible for medical malpractice "tail" coverage. Dr. Geiger-Schorr does not appeal the grant of summary judgment in favor of David and Ludie Gross, d/b/a Gross Insurance Agency. We affirm.

In December 1990, Dr. Geiger-Schorr applied for malpractice insurance through provisions of the Kansas Health Care Provider Insurance Act (HCPIA), otherwise known as the Plan, with the assistance of Gross Insurance Agency. The Plan was designed by the legislature to provide medical malpractice insurance to physicians who cannot obtain it on the open market. The Plan is operated in conjunction with the Fund, which is administered by the commissioner of insurance. In July 1990, the Plan contracted with KaMMCO to sell medical malpractice insurance through authorized agents on behalf of the Plan and to provide claim and underwriting management. Dr. Geiger-Schorr received "claims-made" medical malpractice insurance from KaMMCO for the claims period beginning January 9, 1991.

On June 24, 1991, Dr. Geiger-Schorr contacted Ludie Gross at Gross Insurance Agency to cancel her malpractice coverage effective June 28, 1991. In response to information received from Gross Insurance, Lisa Beam of KaMMCO sent Ludie a letter confirming

the policy cancellation and stating the refund due Dr. Geiger-Schorr for the unused premium.

In August 1991, David Gross spoke with Dr. Geiger-Schorr about the delay in the refund for the unused premium and whether she wanted to buy "tail" coverage. She told David that she did not want to purchase "tail" coverage for medical malpractice.

Dr. Geiger-Schorr spoke with Beam at KaMMCO on August 15, 1991, in regard to her refund. The two did not discuss "tail" coverage. The Fund received Dr. Geiger-Schorr's refund request on August 17, 1991, and the Kansas Department of Insurance sent her a check in early September 1991. The cover letter stated that the enclosed check represented a surcharge refund "due to cancellation" of Dr. Geiger-Schorr's policy. The typed signature of Ron Todd, commissioner of insurance, appeared at the end of the letter.

In July 1992, Dr. Geiger-Schorr learned that a former patient planned to file a medical malpractice action against her. Dr. Geiger-Schorr informed KaMMCO of the possibility of the suit in early August 1992. KaMMCO responded that she was not covered by medical malpractice insurance.

Dr. Geiger-Schorr filed suit in June 1993 asking the court to find a valid malpractice insurance contract in effect and require KaMMCO to insure and defend her in the pending malpractice suit. Following discovery, all the parties filed motions for summary judgment. The trial court denied Dr. Geiger-Schorr's motion for partial summary judgment and granted the defendants' motions for summary judgment.

Dr. Geiger-Schorr argues that the trial court, in granting summary judgment against her, incorrectly interpreted the provisions of K.S.A. 40-3402. Summary judgment is proper where the only questions presented are questions of law. *Fletcher v. Nelson*, 253 Kan. 389, 391, 855 P.2d 940 (1993). Statutory interpretation is a question of law and is subject to this court's unlimited review. *State v. Williams*, 19 Kan. App. 2d 903, 904, 878 P.2d 854 (1994).

The statute in question is part of the Kansas Health Care Provider Insurance Act, K.S.A. 40-3401 *et seq.* The legislature passed the Act in 1976 in response to the medical malpractice insurance

availability crisis and has amended it on numerous occasions. *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 611, 576 P.2d 221 (1978). K.S.A. 40-3402(a) requires all health care providers practicing in the state to obtain malpractice insurance and sets minimum limits on policy coverage. K.S.A. 40-3404(a) directs these providers to pay a surcharge to the Fund, which provides for payment of malpractice claims in excess of policy limits. K.S.A. 40-3403(c).

Dr. Geiger-Schorr focuses on the provision regarding cancellation of basic malpractice coverage. K.S.A. 40-3402(a)(2) states:

> "In the event of termination of basic coverage by cancellation, nonrenewal, expiration or otherwise by either the insurer or named insured, *notice of such termination shall be furnished by the insurer to the commissioner,* the state agency which licenses, registers or certifies the named insured and the named insured. Such notice shall be provided no less than 30 days prior to the effective date of any termination initiated by the insurer or within 10 days after the date coverage is terminated at the request of the named insured and shall include the name and address of the health care provider or providers for whom basic coverage is terminated and the date basic coverage will cease to be in effect. *No basic coverage shall be terminated by cancellation or failure to renew by the insurer unless such insurer provides a notice of termination as required by this subsection."* (Emphasis added.)

KaMMCO sent a letter to Rick Bassett of the Kansas Insurance Department on June 26, 1991, stating that Dr. Geiger-Schorr canceled her malpractice policy because she was moving from the state. A copy of a similar letter written to Ludie Gross on the same day was provided to the Kansas Insurance Department. Lisa Beam, a KaMMCO underwriter, testified that the letter to Bassett was "a standard letter that I would send to Rick Bassett whenever an insured would cancel their policy or the policy would expire." Beam emphasized: "We were required by the Kansas Insurance Department to notify them when a policy was canceled or terminated, and this is the letter I used to do that."

The trial court held that KaMMCO's letter to Bassett substantially complied with the notice provisions of the statute and that, in any event, an insurer's failure to give notice of cancellation to any party does not render the cancellation void when the insured

canceled the policy. Dr. Geiger-Schorr argues that the trial court erred in its interpretation of the statute.

One of the fundamental rules of statutory construction is that the intent of the legislature governs. *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). When a statute is unambiguous, the court must give effect to the intent of the legislature as expressed rather than determine what the law should or should not be. *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992). However, when the interpretation of one section according to the literal import of its words would thwart the purpose of the legislature, the court may disregard as necessary the strict letter of the law. *Jackson v. City of Kansas City*, 235 Kan. 278, 318-19, 680 P.2d 877 (1984). The legislature is presumed to intend that a statute be construed reasonably to avoid unreasonable or absurd results. *Todd v. Kelly*, 251 Kan. 512, 520, 837 P.2d 381 (1992). Further, the court should avoid construing a statute so as to make its application impracticable or inconvenient. 251 Kan. at 515.

Dr. Geiger-Schorr argues that notice must be sent specifically to the commissioner of insurance, not to one of his or her representatives. She points to K.S.A. 40-3401(c), which states that "commissioner" as it is used in the act is defined simply as "the commissioner of insurance."

Dr. Geiger-Schorr asks this court to interpret the notice provision of the statute to mean that KaMMCO was required to address the cancellation letter to Ron Todd, not Bassett, an employee of the Kansas Insurance Department. Beam stated that she always sent the cancellation letters to Bassett. It is clear that Dr. Geiger-Schorr's interpretation of the statute would lead to inefficient results.

The commissioner of insurance is authorized by statute to appoint assistant commissioners and other employees "as shall be necessary to administer the provisions of [the insurance code]." K.S.A 40-110. Clearly, the legislature recognized that a lone commissioner could not personally open every piece of mail or execute the many duties of the office without the assistance of his or her representatives. Under Dr. Geiger-Schorr's interpretation, the

commissioner of insurance would be charged with personally carrying out the vast number of duties assigned to the commissioner under the insurance code and the HCPIA. This is not a reasonable construction of the statute.

Todd and KaMMCO argue that even under a strict construction of the statute, KaMMCO's letter to Bassett substantially complied with the notice provisions. The doctrine of substantial compliance allows the court to recognize as effective a notice which "complies with the spirit and intent of the law but not with its absolute letter." *Mendenhall v. Roberts*, 17 Kan. App. 2d 34, 43, 831 P.2d 568, *rev. denied* 251 Kan. 939 (1992). Substantial compliance requires compliance only as necessary to further the reasonable objective of the statute. The absence of language in the statute describing the consequences of noncompliance invites the court to apply the doctrine. 17 Kan. App. 2d at 43.

K.S.A. 40-3402(a)(2) describes the consequences of noncompliance with the notice provisions only when the malpractice policy is canceled by the insurer. There are no consequences set out for noncompliance after a policy is terminated by the insured. This suggests that substantial compliance with the notice provisions after termination by an insured is sufficient to cancel the policy.

Further, the notice provisions for termination of a malpractice policy are designed to protect the insured health care provider and his or her patients. *Bell v. Simon*, 246 Kan. 473, 481, 790 P.2d 925 (1990). The insurer must provide notice of its decision to terminate coverage 30 days *prior* to the effective date of the termination. This notification is crucial to the insured who must then find a way to obtain other insurance in order to comply with the mandatory coverage provisions of the HCPIA. If, however, the insured health care provider cancels the coverage, notice to the commissioner is not a crucial issue. The statute allows an insurer to provide notification of the insured's cancellation within 10 days *after* the termination. Notice to the commissioner and the licensing agency serves to inform them that the insured provider is no longer eligible to practice medicine in the state and triggers a premium refund to the insured if one is due.

It would serve no reasonable objective of the statute to allow medical malpractice coverage to continue on an insured who canceled his or her own policy simply because the insurer did not give proper notice of the cancellation to the commissioner of insurance. If the commissioner received no notice at all, the worst harm that could come to an insured is a delay in receiving a refund on an unused premium. In this case, the commissioner of insurance obviously received actual notice of the cancellation because he sent Dr. Geiger-Schorr a refund on her premium.

Dr. Geiger-Schorr argues that the court cannot apply the doctrine of substantial compliance to the notice provision of the statute. She cites cases in which appellate courts have held that substantial compliance with a statute is not enough. In *Claus v. Kansas Dept. of Revenue*, 16 Kan. App. 2d 12, 825 P.2d 172 (1991), this court held that a petition for review of a driver's license suspension must be served on the agency head or his or her designee under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* Claus sent the petition for review to the Kansas Department of Revenue (KDR), Division of Vehicles-Driver Control Bureau, not the Secretary of Revenue. KDR admitted receiving actual notice of the petition. This court held, however, that Claus failed to properly serve the agency head, and the petition was dismissed. 16 Kan. App. 2d at 13-14.

Dr. Geiger-Schorr also cites *Pork Motel, Corp. v. Kansas Dept. of Health and Environment*, 234 Kan. 374, 673 P.2d 1126 (1983). In *Pork Motel*, the Kansas Supreme Court compared the general service of process requirements found in the code of civil procedure and the specific requirements for service upon a party to a contempt proceeding. The court held that although substantial compliance with the service requirements of Chapter 60 is sufficient, it is not acceptable under the more stringent contempt statute. 234 Kan. at 390.

Dr. Geiger-Schorr relies on these cases for the proposition that since the HCPIA does not contain a provision mandating substantial compliance, or a provision stating that the statute is to be liberally construed, the notice provision for cancellation of malpractice insurance must be construed against the insurer as strictly as

possible. However, *Claus* and *Pork Motel* are distinguishable because both involve service of process or other documents on a party to a legal proceeding. This is a far cry from the notice requirement regarding an insured's cancellation of his or her own malpractice policy.

Todd and KaMMCO point out in a related argument that even if the statute is strictly construed to mean that notice of cancellation must be sent to the commissioner personally, and even if KaMMCO did not substantially comply, Dr. Geiger-Schorr is not entitled to relief. The statute provides that a policy cannot be canceled by an insurer if the insurer does not provide notice of the cancellation as set out in the statute. The plain language of the statute does not address the consequences of the failure of an insurer to provide adequate notice of cancellation by the insured, which leads us to conclude that cancellation by the insured constitutes the termination of the policy coverage and requires no further action to become effective.

The trial court did not err in holding that KaMMCO's notice of cancellation was adequate, in denying Dr. Geiger-Schorr's motion for partial summary judgment, or in granting Todd and KaMMCO's motion for summary judgment on the issue.

Dr. Geiger-Schorr next argues that the trial court erred in holding that Todd and KaMMCO did not assume a duty to recommend the purchase of "tail" coverage to protect her against claims made after the cancellation of her policy. She relies on Restatement (Second) of Torts § 323 (1964) to argue that Todd and/or KaMMCO assumed a duty to inform her that she needed to purchase tail coverage within 30 days. Section 323 states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking."

Based on our review of Kansas cases, we conclude that Dr. Geiger-Schorr's reliance on § 323 is misplaced. The Restatement specifically states that one who undertakes to render services may

be liable for resulting physical harm to another's person or things. Dr. Geiger-Schorr's exposure to malpractice liability can hardly be characterized as physical harm. Kansas courts have not applied § 323 to hold an actor liable for non-physical harm to persons or things.

Even so, Dr. Geiger-Schorr alleges that KaMMCO undertook to inform certain insureds that tail coverage would be necessary to supplement their insurance once a policy was canceled. She cites a letter from David Gross to the commissioner of insurance stating that KaMMCO informed doctors of the availability of tail coverage when the malpractice policy was canceled.

Beam testified that she did inform those physicians insured directly by KaMMCO of the need for tail coverage after cancellation of a malpractice policy either by letter or over the phone. She emphasized in her testimony the difference between KaMMCO's insurance contracts through the Plan and insurance contracts independent of the Plan. She stated that "we did things differently between the two companies." Beam testified that the agents worked directly with insureds under the Plan. She stated that she did not inform the agents of the need for tail coverage when an agent notified her that an insured wanted to cancel his or her malpractice policy.

Lori Callahan, general counsel and vice president of claims at KaMMCO, testified that KaMMCO operates independently of the Plan as a direct writer, meaning that KaMMCO does not use insurance agents to sell malpractice insurance to physicians. Callahan testified that it was standard procedure to notify the physicians directly insured by KaMMCO of the need for tail coverage when appropriate. Callahan indicated that prior to January 22, 1993, KaMMCO did not inform physicians insured through the Plan of the need for tail coverage. There is some indication that after that date, KaMMCO did provide notice to Plan insureds.

It is clear that in 1991, KaMMCO had undertaken to inform only its own directly insured physicians that tail coverage was available. It is undisputed that Dr. Geiger-Schorr was not directly insured; she was insured through the Plan. KaMMCO informed its directly insured physicians because there were no insurance agents

involved. It is undisputed that Dr. Geiger-Schorr obtained insurance through the Gross Insurance Agency. There is no evidence that KaMMCO assumed any duty to provide notice for those insured through the Plan.

Dr. Geiger-Schorr argues in the alternative that under § 323(b) she relied on a statement made by Beam that she needed no further insurance. Dr. Geiger-Schorr fails to explain how her reliance on the alleged statement caused her harm. There is no indication in the record that Beam admitted making such a statement. Dr. Geiger-Schorr conceded that the conversation took place August 15, 1991, well past the 30-day limit imposed by statute for purchase of tail coverage through the Fund. Whether Beam made the statement is immaterial since Dr. Geiger-Schorr had already missed the deadline for purchase of tail coverage through the Fund. The doctor's reliance on the alleged statement did not cause the harm. The doctor's failure to purchase coverage within the deadline resulted in her exposure to a later suit.

Further, Dr. Geiger-Schorr told David Gross sometime in August 1991 that she did not want to purchase tail insurance. It is not clear in the record whether Gross was offering insurance through the Fund or from a private company.

Dr. Geiger-Schorr argues that she did not know what she was getting when she obtained a claims-made policy. She asserts that she thought, based on a reading of her policy, that she was covered against any malpractice claim made at any time. She complains that she did not understand the nuances of insurance law and that the overall scheme of the HCPIA appears to provide comprehensive malpractice coverage to those who pay the surcharge. Everyone is presumed to know the law. *Knight v. Myers,* 12 Kan. App. 2d 469, 475, 748 P.2d 896 (1988). Further, a party to an insurance contract has a duty to read and understand the contract before signing it. *Miner v. Farm Bur. Mut. Ins. Co., Inc.,* 17 Kan. App. 2d 598, 609, 841 P.2d 1093 (1992), *rev. denied* 252 Kan. 1092 (1993).

The trial court did not err in concluding that neither Todd nor KaMMCO assumed a duty to inform Dr. Geiger-Schorr of the availability of tail coverage, in granting summary judgment in favor

of Todd and KaMMCO, and in denying Dr. Geiger-Schorr's motion for partial summary judgment.

Affirmed.