No. 89,944

Barbara Cunningham and Wanda Yandell, *Appellants,* v.
Braum's Ice Cream and Dairy Stores, *Appellee.*

(80 P.3d 35)

Opinion filed December 12, 2003.

*Patrick C. Smith*, of Loy Law Firm, L.L.C., of Pittsburg, argued the cause and was on the brief for appellants.

*John I. O'Connor,* of The Advocates Group, LLC, of Pittsburg, argued the cause, and *Troy A. Unruh*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Plaintiffs Barbara Cunningham and Wanda Yandell ask us to reverse the district court's summary judgment in favor of defendant Braum's Ice Cream and Dairy Stores (Braum's) in this personal injury action. They sued Braum's after its employees shooed them out of the Parsons ice cream store and, as it turned out, into the path of a tornado. Cunningham and Yandell were injured while driving home, when the tornado threw a truck into their car.

We must decide whether Braum's owed Cunningham and Yandell a legal duty to inform them of a tornado warning and to offer them shelter from the storm.

Summary judgment is appropriate when there remains no genuine issue of material fact for trial and the moving party is entitled

to judgment as a matter of law. K.S.A. 2002 Supp. 60-256(c); see *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

In this negligence action, the first element Cunningham and Yandell must prove is the existence of a duty of care owed them by Braum's. The question of whether a duty exists is a question of law, and the district court's decision that there was no duty under the circumstances presented is reviewable by this court de novo. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983). Both the district court and this court are required to view the available evidence in the light most favorable to the nonmoving party, *i.e.*, Cunningham and Yandell. All facts and inferences that may reasonably be drawn from that evidence must be drawn in their favor. *Bergstrom v. Noah*, 266 Kan. 847, 871, 974 P.2d 531 (1999).

With this standard in mind, the evidence shows that Braum's employees were aware at the time they told Cunningham and Yandell and other customers to leave the store that there was a tornado warning in effect. Braum's employees also were aware, by means of telephone calls from persons outside the store, that there were reports of a tornado sighting in the area.

Braum's has an emergency action plan. Although no copy of the plan is included in the record, Braum's admits that the plan states: "[I]f a tornado is sighted, or a Civil Defense warning sounds, anyone not wishing to leave should be directed to the "milk room." The milk room is an interior refrigerated area inside the store.

Again, viewing the evidence in the light most favorable to Cunningham and Yandell, we accept for purposes of this appeal Cunningham's and Yandell's deposition testimony that Braum's employees told them only that a storm was coming, not that there was a tornado warning. The parties agree that they were not told that a tornado had been sighted in the area or that customers had the option of remaining inside the store and going into the milk room. Without this information, Cunningham and Yandell left the Braum's store at the employees' insistence. They heard no sirens sounding at the time, and they observed nothing ominous about the weather until it was too late.

Cunningham and Yandell advance two arguments to support the existence of a duty on these facts.

The first argument is that this matter should be decided under Kansas law governing premises liability and that Braum's employees failed to abide by the requirement that they act with reasonable care in all of the circumstances. See *Jones v. Hansen*, 254 Kan. 499, Syl. ¶ ¶ 2, 3, 867 P.2d 203 (1994).

Second, they argue that a duty arose under the Restatement (Second) of Torts (1964), quoting § 323 and citing § 324A.

We address each of these arguments in turn.

## Premises Liability

Cunningham and Yandell argue that Braum's had a duty as the possessor of land to warn them of the approaching tornado because it was a foreseeable hazard. The fact that their injuries actually occurred off of the premises is of no consequence, in their view, because the defendant's negligence consisted of the failure to warn and offer shelter to them while they were still in the store.

Historically Kansas law provided that the duty owed by a possessor of real property to an entrant upon the property was dependent upon the status of the entrant. We eliminated common-law distinctions between duties owed to licensees and invitees and set up reasonableness of action and foreseeability of injury as the foundations of premises liability in *Jones*, 254 Kan. at 509. We stated in *Jones*:

"The duty owed by an occupier of land to invitees and licensees alike is one of reasonable care under all the circumstances. Included in the factors that are to be considered in determining whether, in the maintenance of his or her property, the land occupier exercises reasonable care under all circumstances are the foreseeability of harm to the entrant, the magnitude of the risk of injury to others in maintaining such a condition of the premises, the individual and social benefit of maintaining such a condition, and the burden upon the land occupier and/or community, in terms of inconvenience or cost, in providing adequate protection." 254 Kan. at 509-10.

*Jones* concerned an injury occurring on the subject premises. Braum's argues that Kansas law does not create any duty to warn a customer of hazards off the premises and that we should not

extend the rule of *Jones* to situations in which the danger is far removed from the property. We agree that the ruling sought by Cunningham and Yandell would require such an extension. See *DiPietro v. Cessna Aircraft Co.*, 28 Kan. App. 2d 372, 377, 16 P.3d 986 (2000) (property owners have duty of ordinary care to "maintain premises" used by customers in reasonably safe condition); *Collins v. American Drug Stores, Inc.*, 878 F. Supp. 182, 186 (D. Kan. 1995) (Kansas property owner has no duty to keep abutting public sidewalks free from natural accumulation of ice, snow).

Cunningham and Yandell direct our attention to several cases from other jurisdictions dealing with hazards on property adjacent to the subject premises. *Banks v. Hyatt Corp.*, 722 F.2d 214, 225-27 (5th Cir. 1984) (hotel had duty to warn or protect guest from mugging outside entrance); *Stephens v. Bashas' Inc.*, 186 Ariz. 427, 431-32, 924 P.2d 117 (Ct. App. 1996) (warehouse had duty to provide parking to delivery truck driver injured after parking on public street; safe means of ingress and egress required); *Ollar v. George's Place*, 269 Ark. 488, 601 S.W.2d 868 (1980) (restaurant had duty to customer injured on adjoining parking lot); *Southland Corp. v. Superior Court*, 203 Cal. App. 3d 656, 666-68, 250 Cal. Rptr. 57 (1988) (whether convenience store had sufficient control over adjacent lot, whether criminal assault foreseeable questions for jury); *Perkins v. Byrnes*, 364 Mo. 849, 269 S.W.2d 52 (1954) (whether resort negligent in warning guests of danger of flooded river adjacent to property a matter for jury); *Piedalue v. Clinton Elem. Sch. Dist. No. 32*, 214 Mont. 99, 103-05, 692 P.2d 20 (1984) (former owner of irrigation ditch had duty to warn motorist entering adjacent trailer park of dangerous condition); *Fuhrer v. Gearhart by the Sea, Inc.*, 306 Or. 434, 441-42, 760 P.2d 874 (1988) (trier of fact to determine whether resort unreasonable for failing to warn guests of ocean riptides or otherwise provide protection in specific circumstances). Braum's correctly points out that these cases are distinct because they generally involve static risks on adjoining property. We reject these cases as persuasive authority.

Braum's, in turn, cites cases that also are not particularly useful. One is *Bradley v. Board of Butler County Comm'rs*, 20 Kan. App. 2d 602, Syl. ¶ 5, 890 P.2d 1228 (1995), in which our Court of

Appeals held that neither a city nor a county in this state has a duty to warn its citizens of approaching severe weather. Our court had reached a similar result in *Griffin v. Rogers*, 232 Kan. 168, 175, 653 P.2d 463 (1982), based on a general policy that governmental entities and officers owe a duty to the public at large and not to particular individuals. See *Bradley*, 20 Kan. App. 2d at 606-07.

Only one case recognizing a duty to warn customers of a commercial establishment about severe weather off premises has been cited and discussed by the parties: *Mostert v. CBL & Associates*, 741 P.2d 1090 (Wyo. 1987). Our research reveals no other case of this type.

In *Mostert*, members of the Mostert family were attending a movie in a Cheyenne, Wyoming, shopping mall theater when storms moved into the area. Severe thunderstorm, flash flood, and tornado warnings were issued; the weather became progressively worse, and local emergency officials recommended that citizens stay indoors. The theater management was aware of the warnings and of severe flooding but did not pass this information along to the Mosterts and other patrons watching the movie. The Mosterts left the theater after the movie ended and, approximately 2 miles into their journey, were caught in floodwaters. During the family's attempted escape from their vehicle, the Mosterts' daughter drowned.

When the Mosterts' case reached the Wyoming Supreme Court, the court recognized the traditional rule that a landowner has no duty to warn an invitee of risks off of the landowner's premises. It nevertheless chose to depart from it. The court applied factors drawn from *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), a leading case on mental health professionals' duty to warn potential targets of violent patients, to determine that a duty existed. The factors were:

". . . '(1) [t]he forseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the

court system, and (8) the availability, cost and prevalence of insurance for the risk involved.' [Citations omitted.]" 741 P.2d at 1094.

The *Mostert* court concluded: "[The theater] has a duty because of its special relationship to the Mostert family as business invitees, and the superior knowledge it possessed of the off-premises risks. These findings are coupled with the minimal inconvenience on the part of AMC to share any superior knowledge it might have had with the Mosterts." 741 P.2d at 1099.

Justice G. Joseph Cardine, joined by one other justice, filed a concurring and dissenting opinion in *Mostert,* 741 P.2d at 1101. He first criticized the majority's attempt to buttress its decision to extend traditional premises law by analyzing factors from a case having nothing to do with landowners' duties. He then questioned the majority's conclusions about whether those factors would actually support the existence of a duty under the facts.

For example, as to foreseeablity, the dissenting Justice Cardine doubted that the theater could have "foreseen that a patron would drive onto Del Range Boulevard, running [into] six inches of water and crowded with hundreds of cars, and drive two miles down the road into deepening water and finally into a flooded creek bed." *Mostert*, 741 P.2d at 1104. Likewise, Justice Cardine emphasized the broad liability the majority's definition of duty could permit. The burden upon defendants, in his view, would be "mind boggling." 741 P.2d at 1104.

Justice Cardine further stated:

"In the future, it will apply to every business in the mall, every business in Cheyenne, every person having any business relationship with another. It will subject persons to potential liability for injuries from accidents that occur two miles, ten miles, perhaps hundreds of miles from the business because of blizzard conditions, road closures, icing, heavy rains, tornadoes, even perhaps construction work of which the business may be aware. The business proprietor will have no control over the premises where the accident occurs, no ability or right to remedy any defect, and no control over the actions or risks undertaken by his customer." 741 P.2d at 1104.

We concur with Justice Cardine. An extension of premises liability law to hold that a business proprietor has a duty to warn and shelter patrons from severe weather they may encounter on their

journey home from the proprietor's premises makes no logical or legal sense. We decline to extend Kansas law in this way, exposing all commercial enterprises to liability for all manner of accidents befalling their customers while the customers are occupying distant premises outside the control of the enterprise. "The owner of a business is not the insurer of the safety of its patrons or customers." *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 548, 856 P.2d 1332 (1993). What is true for danger on a business' premises is even more true for danger off of them.

### Restatement (Second) of Torts

Cunningham and Yandell next argue that Braum's internal policy qualified as a gratuitous undertaking of a duty to render services to them and that Braum's is therefore liable for failing to exercise reasonable care in the performance of that duty.

The first problem with this argument is that Cunningham and Yandell quote one provision of the Restatement (Second) of Torts and cite a different one. The provision quoted is Restatement (Second) of Torts § 323 (1964), which reads:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
    (a) his failure to exercise such care increases the risk of such harm, or
    (b) the harm is suffered because of the other's reliance upon the undertaking."

The provision cited is Restatement (Second) of Torts § 324A (1964), which reads:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
    (a) his failure to exercise reasonable care increases the risk of such harm, or
    (b) he has undertaken to perform a duty owed by the other to the third person, or
    (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

We have recognized that each of these provisions correctly states Kansas law and can support the existence of a duty in appropriate circumstances. See *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 490, 657 P.2d 532 (1983) (adopting § 323 as a correct formulation of Kansas law); *Schmeck v. City of Shawnee*, 232 Kan. 11, 25-27, 651 P.2d 585 (1982) (applying language of § 324A).

However, § 324A lacks even arguable applicability to the situation before us. It covers a defendant who agrees to undertake, or who engages in some affirmative action demonstrating a willingness to undertake, to provide services to another *for the benefit of a third party*. The plaintiff in a § 324A action is the third party. See *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, 317-18, 913 P.2d 119 (1996) (applying § 324A to engineers who designed bridge under contract with county; engineers should have recognized services necessary for protection of third-party downstream property owners such as plaintiffs).

There was no third party to be benefitted or protected in this case. If a duty arose, it flowed only from Braum's undertaking to provide services directly to "another" under § 323, *i.e.*, Cunningham and Yandell. We therefore disregard plaintiffs' citation of § 324A to support the existence of a duty on the part of Braum's.

Regarding § 323, *Circle Land & Cattle Corp.*, 232 Kan. at 488, was the first case in which we officially subscribed to the Restatement language. In that case, defendant International Harvester (IH) had approached irrigation farmers to monitor their use of certain IH engines and, specifically, the type of oil that helped to run the engines. After taking samples and conducting its analysis, IH assured plaintiffs that the oil was "OK," and plaintiffs continued to use the oil throughout the irrigation season. At that time, it was discovered the conclusion reached after the oil analysis was incorrect and the engines had suffered $160,000 in damages.

When plaintiffs took IH to court, we stated:

"Section 323 is based upon the legal principle that a valuable consideration is not a prerequisite to the existence of a duty to exercise due care. The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken, for nonperformance of which an action lies. [Citation omitted.]

. . . Stated in another way, where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking the act must generally be performed with ordinary or reasonable care." 232 Kan. at 488-89.

In that context, we also quoted Benjamin N. Cardozo, then Chief Judge of the Court of Appeals of New York: " 'The hand once set to a task may not always be withdrawn with impunity though liability would fall if it had never been applied at all. . . .' " 232 Kan. at 489 (quoting *Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167, 159 N.E. 896 [1928]).

In *Circle Land & Cattle*, we ultimately affirmed the jury verdict plaintiffs obtained in the district court, stating: "[W]e have concluded that an issue of fact as to the application of § 323 of the Restatement was present to be determined by the jury from the evidence in the case. We hold that the trial court did not err in overruling International Harvester's motion for a directed verdict." 232 Kan. at 491. Our reference to the existence of a duty under § 323 as an "issue of fact" is not consistent with our numerous subsequent statements holding the existence of a duty is a question of law for the court. See, *e.g.*, *Durflinger*, 234 Kan. at 488; see also *Calwell v. Hassan*, 260 Kan. 769, 784-89, 925 P.2d 422 (1996) (applying § 324A; disapproving implication that duty issue of fact). But *Circle Land & Cattle* remains instructive on the type of evidence that must exist to give rise to a duty under § 323.

Several later cases examining § 323 also guide us in evaluating the facts before us. Among them, *Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239 (1986), is alone in recognizing the existence of a duty.

In *Burgess*, a physician voluntarily undertook to relay information between the mother of a deceased patient and the county coroner regarding the mother's desire that an autopsy be limited. The physician failed to communicate the parameters of the mother's consent, and the mother sued for outrage and negligent infliction of emotional distress when she learned that an autopsy of her son's brain had been conducted and his body buried without it.

With regard to whether a duty arose under § 323, we said:

" 'In most of the cases finding liability, the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief

that it has been removed, or by depriving him of the possibility of help from other sources. Many of the decisions state that some such element is necessary, and that there can be no liability where the conduct in no way aggravates the situation or misleads the plaintiff, and he is left no worse off than he was before. . . . ' " 239 Kan. at 481 (quoting Prosser and Keeton on Torts § 56, pp. 381-82 [5th ed. 1984]).

We further stated:

"In the present case, [the mother] was misled as to the status of the autopsy. She could have acted on her own to prevent the brain autopsy had she not believed [the doctor] had taken care of the matter. While [the doctor] did not directly handle the body during the autopsy, he, at least, provided apparent authority for the coroner to proceed with a full autopsy. Though [the doctor] received no monetary or other type of benefit from the performance of the autopsy, he did take on the responsibility to relay the mother's request for a partial autopsy to the coroner.

"The trial court correctly reasoned that [the doctor] created the situation which resulted in the alleged injury. The doctor assumed a duty which he was not required to assume. He did not follow through. Once performance was begun, [the doctor] owed a duty of care toward the plaintiff." 239 Kan. at 481-82.

In contrast to *Burgess,* in three other cases either we or a panel of our Court of Appeals has held that no § 323 duty arose under the facts.

In *Wicina v. Strecker,* 242 Kan. 278, 747 P.2d 167 (1987), we rejected the claim that a private high school and other defendants which had obtained medical insurance for student athletes had a duty to obtain disability insurance as well. "The defendants' failure to purchase disability insurance did not increase the risk of the plaintiff being injured while playing football nor did the plaintiff rely on the defendants' promise to purchase disability insurance when he decided to play football. Therefore . . . § 323 does not apply here because plaintiff did not rely on any affirmative action taken by the defendants." 242 Kan. at 285-86.

In *Geiger-Schorr v. Todd,* 21 Kan. App. 2d 1, 8, 901 P.2d 515 (1995), a panel of our Court of Appeals rebuffed the plaintiff physician's attempt to invoke § 323. The court relied on evidence that any injury she suffered from not being told to purchase certain malpractice coverage was not "physical," that defendant Kansas Medical Mutual Insurance Company had not assumed any duty to

provide notice to her, and that she had not relied on a later statement reassuring her about additional insurance. 21 Kan. App. 2d at 9-11.

In *Chadwell v. Clements*, 18 Kan. App. 2d 84, 847 P.2d 1344 (1993), an earlier Court of Appeals panel declined to apply § 323 to hold that a duty existed on the part of an employer. In that case, the plaintiff employee was injured by a motorist while the employee was using a marked crosswalk that connected a parking lot to the employer's aircraft plant. Although the employer had sometimes used a security guard on the street to control traffic, the plaintiff had not relied on the guard. In addition, the panel was not persuaded that the employer exercised a level of control over the public street that would be necessary to create liability. 18 Kan. App. 2d at 90-91.

We note as well that cases interpreting the "undertaking" language in § 324A of the duty to third parties stress that a defendant's agreement or affirmative act indicating a willingness to provide services is a threshold requirement for such a duty to arise. See, e.g., *McGee v. Chalfant*, 248 Kan. 434, Syl. ¶ ¶ 5, 6, 806 P.2d 980 (1991) (affirmative act required for undertaking; extent of undertaking defines scope of duty). The reasoning of these cases is equally applicable to the identical "undertaking" language in § 323. See *Wicina,* 242 Kan. at 285-86.

*Honeycutt v. City of Wichita*, 251 Kan. 451, 464, 836 P.2d 1128 (1992), one such § 324A case, demonstrates the need for a definitive undertaking before a duty will arise. In *Honeycutt,* we considered a school district's potential for liability after a kindergartner was hit by a train as he walked home from school.

The evidence showed that parents had been advised at orientation that they were responsible for establishing a safe route to and from school for their children and that kindergartners were permitted to walk home. School district policies stated teachers were responsible for supervision of students during the school day and for a reasonable period of time before and after, but they also made it clear the teachers were not responsible for pupils in route to and from school if the pupils walked or furnished their own transportation. Schools kept children after school to wait for rides

only if that treatment was requested by the parents, and plaintiff's parents had not made such a request. Although establishment of a safety patrol at the railroad tracks where the boy was killed was within school personnel's discretion, no patrols had been established during the relevant time.

On these facts, we held there was no agreement or affirmative act on the part of the school district that constituted an undertaking and no showing that plaintiff and his family relied on or accepted the allegedly assumed duty of protection. 251 Kan. at 468. We agreed with a New York court deciding a similar case that "[t]o hold otherwise would create an intolerable burden for the school." 251 Kan. at 469 (citing *Palella v. Ulmer,* 136 Misc. 2d 34, 37, 518 N.Y.S. 2d 91 (Sup. Ct. 1987).

In this case, we also find the evidence to support a § 323 duty wanting.

The only fact supporting an undertaking is Braum's emergency action plan. As mentioned above, we have no copy of a written policy; we have only a description of the policy from Braum's memorandum in support of its motion for summary judgment. The implication from its language is that it is applicable only when a tornado is sighted or warning sirens can be heard *at the store.* In such circumstances, any customer who does not wish to leave "should be directed to the milk room." In other words, customers who have weather information equal to the employees on duty are to be provided with an opportunity to make a choice. They may elect to leave the store and take their chances elsewhere, or they may elect to remain on the premises in the milk room and take their chances there. The store's only responsibility is to make the milk room available. Customers remain free to evaluate the relative risks of their two options.

In our view, the emergency action plan does not speak at all to the situation presented here, *i.e.,* when the employees of the Braum's store possess potentially superior information about threatening weather still at some distance from the store and not evident to the customers. The emergency action plan does not compel any particular action by Braum's employees in such a situation.

Although Braum's employees theoretically could have passed on all of the weather information in their possession and could have thrown open the milk room door to all customers, the emergency action plan did not mandate either. Like the private school in *Wicina* that purchased medical insurance but was not burdened, as a result, with a duty to buy disability insurance, Braum's normative statement about one set of circumstances did not compel it to act as a weather service or tornado shelter in other circumstances. See *Chadwell,* 18 Kan. App. 2d at 90-92 (no § 323 duty; exercise of discretion to provide crossing guard at certain times does not give rise to provide crossing guard at all times); compare *Honeycutt,* 251 Kan. at 466-70 (no § 324A duty; same exercise of discretion); *Hancock v. United States,* 2001 WL 584357 (D. Kan. 2001) (unpublished opinion) (no § 324A duty; clearing part of sidewalk did not give rise to duty to clear entire sidewalk).

Even if Braum's emergency action plan could be viewed as a sufficient undertaking to trigger a duty in these circumstances, we also note that tornadoes are notorious for their caprice. Kansas stories of one building being demolished while its next-door neighbor is left completely intact are legion. At the time Cunningham and Yandell left Braum's, no one in that store could have said with any assurance of accuracy whether the place where they sat was more safe than the place they would travel. No one could have predicted exactly where shelter would be needed or whether the milk room would withstand any tornado's destructive power. Hindsight is not enough to say that Braum's conduct increased the risk of harm to plaintiffs as a matter of law.

And, finally, no duty arose under § 323 because there is no evidence that plaintiffs relied upon Braum's emergency action plan. This separates this case from *Circle Land & Cattle* and *Burgess,* in which defendants' behaviors induced plaintiffs' detrimental reliance. Here Cunningham and Yandell cannot demonstrate that they looked to Braum's for services they now argue Braum's had a legal obligation to provide. All Kansans soon become acquainted with the wrath of the wind. It benefits no one to lay down a legal

rule that encourages people caught in that wrath to lay blame on others for their lack of awareness.

Affirmed.