IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,883

JOEANN WILLIAMS, ERIC WILLIAMS, HAZEL S. NOBLE, W.J.W., and L.L.W.,
*Appellants*,

v.

C-U-OUT BAIL BONDS, LLC,
*Defendant*, and
CITY OF OVERLAND PARK, KANSAS, *ex rel*. OVERLAND PARK POLICE DEPT.,
*Appellee*.

SYLLABUS BY THE COURT

1.

Whether a district court erred by granting a motion to dismiss for failure to state a claim is a question of law subject to unlimited review.

2.

An appellate court reviewing a district court's decision to grant a motion to dismiss will assume as true the well-pleaded facts and any inferences reasonably drawn from them. If those facts and inferences state *any* claim upon which relief can be granted, dismissal is improper.

3.

A pleading's bare legal conclusions need not be credited absolutely in the same way that the plaintiffs' factual allegations must be when a judge rules on a motion to dismiss. But, in this case, the amended petition's allegations that bail bondsmen intended to enter the plaintiffs' home without legal authority and that police officers left the scene with full knowledge of the bondsmen's illegal conduct were not bare legal conclusions.

1

4.

Whether a duty exists is a question of law.

5.

The mere fact that a governmental entity owes a legal duty to the public at large does not establish that the governmental entity owes a duty to an individual member of the public. However, in this case, the amended petition alleged sufficient facts to support a police undertaking of a duty owed to the individual plaintiffs under Restatement (Second) of Torts § 323 to completely investigate bail bondsmen's forced entry into the plaintiffs' home.

6.

Whether a governmental entity is immune from liability under an exception in the Kansas Tort Claims Act is a matter of law. Accordingly, appellate review is de novo.

7.

Liability is the rule, and immunity is the exception for governmental entities sued under the Kansas Tort Claims Act. In this case, once police had undertaken a duty owed to the plaintiffs their decision to discontinue an investigation of bail bondsmen's potentially illegal conduct was not protected by discretionary function immunity.

Review of the judgment of the Court of Appeals in 54. Kan. App. 2d 600, 402 P.3d 558 (2017). Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed October 11, 2019. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed, and the case is remanded to the district court for further proceedings.

*Curtis N. Holmes*, of Holmes Law Office, LLC, of Olathe, was on the brief for appellants.

*Michael K. Seck*, of Fisher, Patterson, Sayler & Smith, LLP, of Overland Park, was on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal concerns whether a police duty to investigate bail bondsmen's entry into a private home arose and, if so, whether the City of Overland Park is immune from any liability for police officers' breach of the duty.

Those present in the home at the time the bail bondsmen forced their way inside sued the bondsmen's company, C-U-Out Bail Bonds, LLC, and the City on a variety of claims. A district court judge dismissed the City as a defendant, ruling the plaintiffs failed to state a valid cause of action. A Court of Appeals panel affirmed, and this court granted the plaintiffs' petition for review.

We conclude today that the plaintiffs' amended petition alleged sufficient facts to support (a) potential intentional illegal conduct on the part of the bail bondsmen, (b) a police undertaking of a duty to investigate owed to the plaintiffs individually, and (c) no discretionary function immunity for the City under the Kansas Tort Claims Act (KTCA).

FACTUAL AND PROCEDURAL BACKGROUND

Agents of C-U-Out came to the home of JoeAnn and Eric Williams at about 11 p.m. in search of Rickesha Wright, the Williamses' daughter-in-law. JoeAnn; Eric; Hazel Noble, JoeAnn's 90-year-old mother; and two of JoeAnn's grandchildren were in the home at the time.

The agents' entry into the home became the subject of this lawsuit brought by the home's occupants. The plaintiffs' amended petition alleged:

3

"XI.

"The instant causes of action arise[] from the conduct of agents and/or employees of the above-named Defendants while acting within the course and scope of their employment.

"XII.

"At approximately 11:00 o'clock p.m., on the evening of Wednesday, August 6th, 2014, several armed representatives of Defendant, C-U-Out, arrived at a single family residence occupied at the time by all of the above-named Plaintiffs. Upon information and belief, Plaintiffs allege that the representatives of C-U-Out were attempting to locate an individual by the name of Rickesha Wright (hereinafter 'Ms. Wright'), the daughter-in-law of the first and second named Plaintiffs herein. According to the representatives of C-U-Out, Ms. Wright was a criminal defendant who had been released on bond and had absconded from the law, and as a result of which her surety bond[,] which had been paid by C-U-Out[,] was in jeopardy of being revoked.

"XIII.

"The representatives of C-U-Out knocked at the door and were met by Plaintiff, JoeAnn Williams (hereinafter 'Ms. Williams'), who answered the door. The representatives inquired as to whether Ms. Wright was present, at which point Ms. Williams informed them that Ms. Wright was not at the house.

"XIV.

"The representatives of C-U-Out then asked to enter the residence to verify that Ms. Wright was not present, at which point Ms. Williams reiterated that Ms. Wright was not at the home and told them that they could not enter. She also informed them that she was caring for her elderly mother who was inside the home suffering from the effects of Alzheimer's Disease.

4

"XV.

"Ms. Williams closed the door and returned to care for her mother at which time the representatives of C-U-Out began an attempt to force the door open with a steel battering ram.

"XVI.

"Ms. Williams then returned to the front door and told the representatives of C-U-Out again that Ms. Wright was not present, that they were frightening everyone inside the home, and that she intended to call the police. Whereupon one of the representatives of C-U-Out put his foot in the door, informed Ms. Williams that she would be charged with aiding and abetting a felon if she continued to refuse to let them in, and when Ms. Williams' dog started barking at the representative, he put his hand on his gun as if preparing to shoot the dog.

"XVII.

"While holding the door against the representative's foot, Ms. Williams called the Overland Park Police Department and uniformed officers of the Overland Park Police Department arrived a few minutes later.

"XVIII.

"While two (2) of the representatives of C-U-Out remained at the front porch attempting to force the front door of the residence open, another of the representatives momentarily left to speak with the police officers who were just beyond the curtilage of the home. At that moment, representatives of C-U-Out who had been standing on the front porch forcibly entered the residence, pushing Ms. Williams backwards. Throughout this incident, the police officers remained outside their patrol unit and observed the forcible entry without taking any action. After the representatives of C-U-Out had forced their way into the home, Ms. Williams called out to the police officers for assistance.

"XIX.

"In response, the officers told Ms. Williams that this was outside of their jurisdiction and that they could do nothing about it and proceeded to withdraw from the scene, leaving Plaintiffs alone and at the mercy of the armed representatives of C-U-Out.

"XX.

"Shortly after the police officers had left the scene, the representatives of C-U-Out proceeded to search the residence going so far as to enter the private bedroom of Ms. William[s'] ninety (90) year-old mother, Plaintiff, Hazel S. Noble, who was in bed, and the private bedrooms of Ms. Williams' grandchildren, Plaintiffs W.J.W. and L.L.W. who were also present.

"XXI.

"After failing to locate Ms. Wright, the representatives of C-U-Out then left the home threatening Plaintiffs that they would return and do another search until they found her.

"XXII.

"The representatives had no personal knowledge that Ms. Wright was or even had been at the home, and, in fact, Ms. Wright was never at the home at the time of the above-described incident, nor was there any available evidence at the time to suggest that she was."

The plaintiffs' only claim against the City was labeled "negligent failure to protect." It formed Count III of the amended petition and stated:

"XXXIII.

"Plaintiffs allege that at all times material hereto, the officers of the Overland Park Police Department and by extension, the City of Overland Park, under the doctrine

6

of *Respondeat Superior* had an affirmative obligation and duty to protect persons within the jurisdictional limits of the City of Overland Park.

"XXXIV.

"Plaintiffs further allege that the incident described above took place within the jurisdictional limits of the City of Overland Park.

"XXXV.

"Plaintiffs further allege that the police officers who were present at the home of Plaintiffs at the time of the incident described above were personally aware of the facts and circumstances which led to the incident, and had been called to the scene to protect the peace.

"XXXVI.

"Plaintiffs further allege that once the officers were notified of the call, affirmatively responded to the call, presented themselves at the scene, and were made aware of the circumstances as previously described herein, they had an affirmative duty to remain at the scene in order to protect Plaintiffs until the dangers associated with the confrontation between Plaintiffs and armed representatives of Defendant, C-U-Out who were then attempting forcibly to enter Plaintiffs' private residence had passed.

"XXXVII.

"The officers of the Overland Park Police Department violated their affirmative duty to protect Plaintiffs when they left the vicinity of Plaintiffs' home after having been called to and appearing at the scene with full knowledge that there were armed representatives of a bonding company who had expressed their intention of forcibly entering the private residence without the permission of the occupants and without legal authority, and had actually forcibly entered the residence without the permission of the occupants and without legal authority.

7

"XXXVIII.

"As a proximate result of the breach of the duty of the officers of the Overland Park Police Department, the representatives of C-U-Out were permitted forcibly to enter the private residence of Plaintiffs without privilege or legal authority and to invade the privacy of Plaintiffs. In so doing, the officers of the Overland Park Police Department failed to protect the rights of Plaintiffs in violation of their duty to do so.

"XXXIX.

"Plaintiffs further allege that the foregoing incident was subject to an internal investigation conducted by the Office of Professional Standards of the Overland Park Police Department and was found to be substantiated.

"XL.

"Pursuant to the Kansas Tort Claims Act, Plaintiffs thereafter filed a Notice of Tort Claim with the City of Overland Park more than ONE HUNDRED TWENTY (120) days prior to the filing of the instant Amended Petition to which there has been no response by Defendant, City of Overland Park, as of the current date.

"XLI.

"As a result of the foregoing, Plaintiffs have suffered damages and are entitled to all remedies permitted at law therefor."

The parties agree that the City filed a motion to dismiss, but the motion does not appear in the record on appeal.

The plaintiffs' response, which is in the record, says the City sought dismissal under K.S.A. 2016 Supp. 60-212(b)(6) because "the City owed no duty to Plaintiffs which was breached, and that the City is immune from liability pursuant to K.S.A. § 75-6104(c) and (e)."

8

The plaintiffs acknowledged in their response that law enforcement officers generally owe a duty only to the public at large and not to particular individuals. Despite this general rule, referred to as the public duty doctrine, the plaintiffs argued that law enforcement officers can owe a special duty to victims of criminal acts. Citing *Lovitt v. Board of Shawnee County Comm'rs*, 43 Kan. App. 2d 4, 221 P.3d 107 (2009), they said that "[a] special duty arises when the government agency perform[s] an affirmative act or ma[kes] a representation that under the circumstances create[s] a justifiable reliance on the part of the person injured."

On immunity, the plaintiffs noted the City had not "provided [any] authority to suggest that law enforcement ever acts within its sound discretion when it allows for the commission of a serious crime in its very presence to which it has been called to respond and possesses the capacity to prevent."

The City apparently filed a reply in support of its motion, but, again, it is not included in the record on appeal.

The district judge granted the City's motion.

> "In the Amended Petition, the Plaintiffs have alleged that the City's Police Department was called to assist them in stopping a trespass upon their property, unlawful entry into the home and, possibly, an assault with a firearm or [at] least a threat to unlawfully discharge the firearm and damage the property of the Plaintiffs. Police Officers were dispatched to the Plaintiffs' home, but they declined to intervene. The Plaintiffs['] home was invaded by agents of the co-Defendant, C-U-Out Bail Bonds, LLC, because the Police Officers refused to do their jobs in protecting Plaintiffs or enforcing the laws of this State. The agents of the bail bond company claimed to be searching for a fugitive who had absconded from the law. There is no indication that a warrant existed or that the police made any investigation to see whether a valid bench warrant existed or not. The City's Police Officers did nothing to stop the invasion of the home or threats

9

made by armed agents of the bail bond company. Police Officers left the area. The bail bond agents invaded the privacy of the home. No fugitive was found in the residence or immediate area of the Plaintiffs' home.

"Taking all of the allegations as true, the Court finds that Plaintiffs[] have failed to state a claim upon which relief can be granted. Further, the Police Officers and thereby the City as their employer are immune from liability under the Kansas Tort Claims Act in the performance of their discretionary functions."

On the issue of KTCA immunity, the judge cited *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982), saying *Robertson* made "clear that despite notice pleading it is incumbent upon the Plaintiffs to allege facts sufficient to remove the immunity." He concluded that the plaintiffs had failed to do so.

On duty, the judge wrote:

"The instant case is unlike *Jackson vs. City of Kansas City*[, 263 Kan. 143, 162-63, 947 P.2d 31 (1997),] where the Police were under an affirmative duty to protect a prisoner in custody, handcuffed and seated on the sidewalk, from harm. Jackson's throat was cut when he was not protected from the person he had been accused of assaulting in a domestic disturbance. While the Police investigated, Jackson was handcuffed and unable to protect himself. The Court found a duty for the Police to protect those in custody from outside harm.

"There is no such affirmative duty under Kansas law shown by the Plaintiffs in this case."

The plaintiffs appealed to the Court of Appeals, challenging the district judge's conclusions that the police owed them no duty and that the City was immune from suit under the KTCA discretionary function exception. For its part, the City asked the panel to apply a federal standard for determining whether to grant a motion to dismiss for failure

to state a claim. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (pleading must "'contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action'"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (federal courts must determine whether claim has "facial plausibility"). They also argued that the district court judge's reasoning and result on the two grounds for dismissal should be upheld.

The panel declined the City's invitation to adopt the federal standard for reviewing a motion to dismiss for failure to state a claim. Under the governing Kansas standard, it acknowledged that it must consider all of the plaintiffs' well-pleaded facts as true, but it said "nothing requires us to treat the legal conclusions contained within the petition as also being true." *Williams v. C-U-Out Bail Bonds*, 54 Kan. App. 2d 600, 605, 402 P.3d 558 (2017). The panel specifically said it would disregard two such conclusions, "the truth of which the City has not admitted": "C-U-Out representatives intended *to enter the house without legal authority*" and "the police officers who responded to the call left with full knowledge that the bail bondsmen were attempting *to enter the house illegally*." 54 Kan. App. 2d at 605. The panel then cited two statutes and one case dealing with bail bondsmen and arrests without engaging in any meaningful analysis. See 54 Kan. App. 2d at 606 (citing K.S.A. 22-2809; K.S.A. 22-2405[3]; *State v. Burhans*, 277 Kan. 858, Syl. ¶ 2, 89 P.3d 629 [2004]).

On the merits of the duty issue, the panel recited the public duty doctrine—"the general principle that a governmental agency owes duties to the public at large rather than to individuals." *Williams*, 54 Kan. App. 2d at 607. To avoid application of the doctrine to bar the plaintiffs' claim against the City, the panel said, the plaintiffs must establish the existence of a special relationship between themselves and the police officers. Reviewing existing caselaw, the panel concluded the plaintiffs' pleadings did not meet this test. 54 Kan. App. 2d at 607-11. Like the district judge before it, the panel emphasized its

11

understanding that the plaintiffs' claim was based on the officers' *inaction* after arriving at the Williams home.

> "[T]he only affirmative act taken by the government employees—responding to a 911 call—was clearly within the officers' duties under statutes or agency regulations to preserve the peace and protect public rights. Failing to intervene is an omission or an inaction[,] which cannot reasonably be construed under our precedent as the performance of an affirmative act which could create the special relationship necessary to fall within the exception to the public duty doctrine. Nor did the officers' act of responding to the Plaintiffs' call for help, as they were duty-bound to do, arguably cause Plaintiffs any injury. Instead, according to the amended petition, it was the officers' failure to intervene that injured them. [Citations omitted.]" 54 Kan. App. 2d at 611.

Although this holding that no duty arose could have ended the appeal, the panel nevertheless proceeded to discuss and rule upon the KTCA immunity issue as well.

The panel identified the discretionary function exception to government liability under K.S.A. 2016 Supp. 75-6104(e) as the exception to be examined and noted that "no mandatory duty or guideline has been shown that would have governed the means by which the police officers investigated the situation," 54 Kan. App. 2d at 615, but it specifically focused on whether there was a requirement that officers arrest the C-U-Out agents. It concluded that "a plain reading of [the] statute authorizing law enforcement officers to make arrests supports the conclusion that the decision to make an arrest is discretionary," and thus the exception shielded the City from liability. 54 Kan. App. 2d at 615-16 (citing K.S.A. 22-2401).

The plaintiffs petitioned this court for review on what they outlined as three issues:  (1) whether the panel erred in concluding the plaintiffs failed to allege sufficient facts to support the conclusion that C-U-Out's agents lacked legal authority to invade the plaintiffs' home; (2) whether the panel erred in concluding the officers did not owe

12

plaintiffs an individual duty; and (3) whether the panel erred in concluding that the officers and thus the City were immune under the KTCA. We granted review of all issues.

DISCUSSION

"Whether a district court erred by granting a motion to dismiss for failure to state a claim is a question of law subject to unlimited review." *Cohen v. Battaglia*, 296 Kan. 542, Syl. ¶ 1, 293 P.3d 752 (2013).

Our traditional test for review of motions to dismiss is often stated and familiar:

"When a defendant uses [K.S.A. 60-212(b)(6)] to challenge the legal sufficiency of a claim, the court must decide the issue based only on the well-pled facts and allegations, which are generally drawn from the petition. Courts must resolve every factual dispute in the plaintiff's favor when determining whether the petition states any valid claim for relief. Dismissal is proper only when the allegations in the petition clearly demonstrate that the plaintiff does not have a claim. *Halley v. Barnabe*, 271 Kan. 652, 656, 24 P.3d 140 (2001) (citing *Ripley v. Tolbert*, 260 Kan. 491, 493, 921 P.2d 1210 [1996], and *Bruggeman v. Schimke*, 239 Kan. 245, 247-48, 718 P.2d 635 [1986]). Likewise, appellate courts reviewing a district court's decision to grant a motion to dismiss will assume as true the well-pled facts and any inferences reasonably drawn from them. If those facts and inferences state *any* claim upon which relief can be granted, dismissal is improper. *Cohen v. Battaglia*, 296 Kan. 542, 545-46, 293 P.3d 752 (2013)." *Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, 767-68, 388 P.3d 84 (2017).

Stated another way, if the facts alleged in plaintiffs' amended petition and the reasonable inferences arising from them stated a claim based on their theory "or any other possible theory," we must reverse the district court and the Court of Appeals. See *Cohen*, 296 Kan. 542, Syl. ¶ 2, 545-46. It is also important to remember that, "[b]ecause Kansas is a

13

notice-pleading state, the petition is not intended to govern the entire course of the case." *Berry v. National Medical Services, Inc.*, 292 Kan. 917, 918, 257 P.3d 287 (2011). "[T]he pretrial order is the ultimate determinant as to the legal issues and theories on which the case will be decided." *Unruh v. Purina Mills*, 289 Kan. 1185, 1191, 221 P.3d 1130 (2009).

As noted above, the City urged the Court of Appeals to adopt and apply a federal standard for review of motions to dismiss that is more difficult for plaintiffs to meet than the traditional Kansas standard. Compare *Twombly*, 550 U.S. at 555 (pleading must "'contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action'"), and *Iqbal*, 556 U.S. at 678 (federal courts must determine whether claim has "facial plausibility"), with *Halley v. Barnabe*, 271 Kan. 652, 655-57, 24 P.3d 140 (2001) (quoting *Noel v. Pizza Hut, Inc.*, 15 Kan. App. 2d 225, 231-32, 805 P.2d 1244, *rev. denied* 248 Kan. 996 [1991]) (Kansas courts have "sound reasons for exercising judicial skepticism towards dismissal of a petition for failure to state a claim prior to the completion of discovery"). The City did not favor the panel with any argument beyond an assertion of its druthers, and the panel did not do as it suggested. The City did not file a cross-petition for review on this point and did not even mention its preferred federal standard in its response to the plaintiffs' petition for review. We therefore do not reach the issue of whether Kansas courts should adopt and apply the federal standard in this case.

*Sufficiency of Facts to Support Illegal Conduct*

Plaintiffs first challenge the Court of Appeals panel's characterization of their allegations that C-U-Out agents intended to enter the house "without legal authority" and that the police officers left the scene with full knowledge that the bail bondsmen "were attempting to enter the house illegally" as bare legal conclusions unworthy of credit or consideration. *Williams*, 54 Kan. App. 2d at 605. The panel described the conclusions as

unadmitted by the defendants and ruled that the amended petition omitted "the underlying factual allegations upon which such legal conclusions could arguably be built, such as whether Rickesha Wright resided at the Williams' house on the date the bail bondsmen invaded it or whether Wright had told the bail bondsmen that she did." 54 Kan. App. 2d at 605-06.

Although we agree with the panel that a pleading's bare legal conclusions need not be credited absolutely in the same way that the plaintiffs' factual allegations must be when a judge rules on a motion to dismiss, we disagree with the panel that the two statements it referenced are bare legal allegations it was free to disregard. Indeed, the panel's observation that the City and C-U-Out had not admitted the agents intended to break the law or that the police officers knew of that intention is telling. The panel's need to mention the observation demonstrates that the existence of such an intention was a matter of fact, subject to later proof. Although the ultimate decision on whether the agents acted lawfully or unlawfully and what the agents and the police officers knew and when they knew it would certainly be measured against the content of the governing law, the content of the law alone could not settle the contested issue.

Further complicating the question, we note that the governing law, despite the panel's intimations to the contrary, is not inevitably clear in Kansas.

To begin with, the C-U-Out agents' authorization to force entry into a home to apprehend a person in Wright's position has three possible sources: common-law privilege; statutory provisions; and contract, that is, the bond agreement between Wright and C-U-Out. See *Burhans*, 277 Kan. at 863-68.

Under common law recognized and applied in Kansas, a bondsman may arrest a principal such as Wright, even if that arrest requires breaking and entering the principal's own home. 277 Kan. at 863-64. But common law does not permit a bondsman unfettered

15

legal access to a third party's home to search for a principal subject to bond. Indeed, a bondsman's forcible entry into a third party's dwelling to arrest a person who does not reside there and who has not been observed there may expose the bondsman to successful prosecution for criminal trespass or assault. See 277 Kan. at 862, 868, 872-73. The information in the record does not establish that Wright did or did not live at the Williamses' home. Her absence at the 11 p.m. time of C-U-Out's agents' entry gives rise to a reasonable inference that she did not live there.

Kansas statutory law also does not indisputably allow the type of conduct C-U-Out's agents engaged in. The main statutory provision on bondsmen does not directly address entry into a principal's or another's home, although it provides generally that a principal's surety may make an arrest of the principal and deliver him or her to law enforcement custody. See K.S.A. 22-2809. A second provision sets up safeguards for such arrests, requiring that any surety or agent of a surety

> "who intends to apprehend any person in [Kansas] . . . shall inform law enforcement authorities in the city or county in which such surety or agent of a surety intends such apprehension, *before attempting such apprehension*. The surety or agent of a surety shall present to the local law enforcement authorities a certified copy of the bond, a valid government-issued photo identification, written appointment of agency, if not the actual surety, and all other appropriate paperwork identifying the principal and the person to be apprehended. Local law enforcement may accompany the surety or agent." (Emphasis added.) K.S.A. 2014 Supp. 22-2809a(b).

We cannot be certain at this point that C-U-Out complied with this provision. But the allegation that one of the agents spoke to the police officers gives rise to a reasonable inference that law enforcement may have been unaware of the attempt to apprehend Wright before the officers arrived at the Williamses' home that night.

The third potential source of authority for C-U-Out's entry—the bond agreement—is unavailable for our review because it is not contained in the record on appeal. However, the amended petition alleged that the C-U-Out agents had "no personal knowledge that Ms. Wright was or even had been at the home, and, in fact, Ms. Wright was never at the home at the time of the . . . incident, nor was there any available evidence at the time to suggest that she was." This allegation gives rise to a reasonable inference that the C-U-Out agents lacked information from the bond agreement to support Wright's residence at the Williamses' home.

In short, the C-U-Out agents may have been acting lawfully or unlawfully. They may have known one way or the other; the police officers may have known one way or the other. These are fact issues to be determined under the governing law. Under our standard requiring us to treat all facts alleged in the amended petition and the reasonable inferences to which they give rise as true, we conclude that the Court of Appeals panel was too hasty in disregarding the amended petition's assertions that the agents intended to act illegally and that the City's police officers knew it and turned a blind eye.

*Existence of a Duty*

Having ruled that the plaintiffs alleged sufficient facts in their amended petition to support their claim that the C-U-Out agents intended to act illegally and that the police officers knew it, we turn to whether the plaintiffs have any hope of establishing that the police, and thus the City, had a duty of reasonable care that required them to respond differently. As is always true with any negligence claim, the plaintiffs ultimately must prove by a preponderance of the evidence "'(1) a duty owed to the plaintiff[s], (2) breach of that duty, (3) causation between the breach of duty and the injury to plaintiff[s], and (4) damages suffered by the plaintiff[s]." *Manley v. Hallbauer*, 308 Kan. 723, 726, 423 P.3d 480 (2018).

17

"'Whether a duty exists is a question of law.'" *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 221, 262 P.3d 336 (2011).

As the Court of Appeals panel recognized, the first hurdle that a plaintiff suing a governmental entity in negligence generally must overcome is establishing that the entity owed a duty to the plaintiff individually rather than a duty to the public at large. See *Keiswetter v. State*, 304 Kan. 362, 365, 373 P.3d 803 (2016) (discussing public duty doctrine).

The mere fact that a governmental entity owes a legal duty to the public at large does not establish that the governmental entity owed a duty to an individual member of the public. See *Montgomery v. Saleh*, 55 Kan. App. 2d 429, 438-39, 419 P.3d 8 (2018) (quoting *Kirk v. City of Shawnee*, 27 Kan. App. 2d 946, Syl. ¶ 3, 10 P.3d 27 [2000]). A law enforcement officer's general duty to preserve the peace is one such duty. Accord *Mills v. City of Overland Park*, 251 Kan. 434, Syl. ¶ 5, 837 P.2d 370 (1992) ("As a general rule, the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large."); see *Commercial Union Ins. Co. v. City of Wichita*, 217 Kan. 44, 53, 536 P.2d 54 (1975); see also *South et al. v. State of Maryland, Use of Pottle*, 59 U.S. (18 How.) 396, 402-03, 15 L. Ed. 433 (1855) ("It is an undisputed principle of the common law, that for a breach of a public duty, an officer is punishable by indictment; but where he acts ministerially, and is bound to render certain services to individuals . . . he is liable for acts of misfeasance or non-feasance to the [injured] party.").

To warrant an exception to the public duty doctrine, a plaintiff suing a governmental entity must establish either a special relationship or a specific duty owed to the plaintiff individually. See *Mills*, 251 Kan. 434, Syl. ¶ 5 ("Absent some special relationship with or specific duty owed an individual, liability will not lie for damages.").

The Restatement (Second) of Torts outlines several special relationships that may form the basis for such a government-entity duty, and we have used the Restatement as authority for establishing a route to liability in the past. See *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 624-25, 971 P.2d 1169 (1999) (discussing special relationships set out in Restatement [Second] of Torts §§ 314A, 316-319, and 320 [1964]). The special relationships discussed in Restatement §§ 314A-320 include those between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities and third parties, and persons with custody of another and third parties. See *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991). The existence of one of these relationships may create a duty for the actor to control the conduct of another, either to protect that person or third parties. See Restatement (Second) of Torts § 315.

This list of special relationships constitutes one set of bases for an exception to the general rule that the "fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement (Second) of Torts § 314 (1965) (duty to act for protection of others). But a duty of affirmative action to aid another also may arise in other situations. See Restatement (Second) of Torts § 321 (duty to act when prior conduct found to be dangerous); § 322 (duty to aid another harmed by actor's conduct); § 323 (negligent performance of undertaking to render services); § 324 (duty of one who takes charge of another who is helpless); § 324A (liability to third parties for negligent undertaking).

Of particular note, Restatement (Second) of Torts § 323 recognizes a cause of action for negligent performance of an undertaking to render services. See *Sall v. T's, Inc.*, 281 Kan. 1355, 1361-72, 136 P.3d 471 (2006) (applying § 323 to nongovernmental defendant).

19

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965).

In drafting this section of the Restatement, the American Law Institute included two caveats:

"The Institute expresses no opinion as to whether:

"(1) the making of a contract, or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section, or

"(2) there may not be other situations in which one may be liable where he has entered upon performance, and cannot withdraw from his undertaking without leaving an unreasonable risk of serious harm to the other."

Section 323 applies "whether the harm to the other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it." Restatement (Second) of Torts § 323, comment a. The rule applies both to undertakings that are gratuitous and those undertaken for consideration.

With respect to termination of gratuitous aid, the Restatement takes the position that the person is "not required to continue [the service] indefinitely, or even until he has

20

done everything in his power to aid and protect the other." Restatement (Second) of Torts § 323, comment c. Generally, the actor can abandon aid at any time.

"Where, however, the actor's assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so." Restatement (Second) of Torts § 323, comment c.

The Institute also noted:

"The Caveat also leaves open the question whether there may not be cases in which one who has entered on performance of his undertaking, and cannot withdraw from it without leaving an unreasonable risk of serious harm to another, may be subject to liability even though his conduct has induced no reliance and he has in no way increased the risk. Clear authority is lacking, but it is possible that a court may hold that one who has thrown rope to a drowning man, pulled him half way to shore, and then unreasonably abandoned the effort and left him to drown, is liable even though there were no other possible sources of aid, and the situation is made no worse than it was." Restatement (Second) of Torts § 323, comment e.

As this court has noted in discussing § 323, that section is

"based upon the legal principle that a valuable consideration is not a prerequisite to the existence of a duty to exercise due care. The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken, for nonperformance of which an action lies. . . . Stated in another way, where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking the act must generally be performed with ordinary or reasonable care. In 1928, Benjamin N. Cardozo,

21

then Chief Judge of the Court of Appeals of New York, in *Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896 (1928), stated the rule in the following language:

> """It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all" [Citations omitted]. The plaintiff would bring its case within the orbit of that principle. The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all. . . .' p. 167." *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 488-89, 657 P.2d 532 (1983).

This court has applied a similar section of the Restatement in the context of a police officer's duty. See *Fudge v. City of Kansas City*, 239 Kan. 369, 373, 720 P.2d 1093 (1986) (applying Restatement [Second] of Torts § 324A, which expands liability of negligent performance of undertaking to third parties), *superseded by statute on other grounds as stated in Woodruff v. City of Ottawa*, 263 Kan. 557, Syl. ¶ 8, 951 P.2d 953 (1997).

In *Fudge*, James E. Fudge's wife brought a wrongful death and survival action against the City of Kansas City and various police officers after her husband was killed in an accident. The plaintiff alleged that the officers should have taken the intoxicated person who caused the accident into custody because they knew that the person had the potential to harm others.

This court held that the officers owed James Fudge a duty under those circumstances. *Fudge*, 239 Kan. at 373. The officers' duty to take the intoxicated person into custody stemmed from the police department's policy requiring officers to take an alcohol- or drug-incapacitated person into protective custody if he or she is likely to cause physical injury to the person or another. 239 Kan. at 372-73. This court relied on Restatement (Second) of Torts § 324A, which reads:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Returning to this case, in light of the various duties outlined above, we cannot say that the plaintiffs' amended petition failed to state a claim upon which relief could be granted because it lacked allegations sufficient to demonstrate the existence of a duty owed to the plaintiffs individually. See *Cohen*, 296 Kan. at 545-46 (if well-pled facts and inferences state any claim upon which relief can be granted, dismissal improper); *Halley*, 271 Kan. at 656 (dismissal proper only when petition clearly demonstrates plaintiff does not have claim). Although the existence of a duty raises a question of law, where the defendant's duty is predicated on an affirmative act or undertaking, there is a threshold factual question of whether the defendant's behavior was such that it could trigger a duty. See *Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 894, 80 P.3d 35 (2003) (defendant's agreement or affirmative act indicating willingness to provide services is a threshold requirement for duty to arise). Moreover, in situations such as this, the factual scope of an undertaking will define the scope of the duty. See *McGee,* 248 Kan. at 442.

The facts alleged in the plaintiffs' amended petition and the reasonable inferences arising from those facts lead to the conclusion under § 323 that the officers undertook to

23

render services to the plaintiffs. They did not merely respond to JoeAnn's 911 call; they also remained at the scene for a time, observing the C-U-Out agents' actions; and they spoke to one of the agents, thereby at least initiating an investigation. They did not, in the plaintiffs' view, continue or complete their investigation, abandoning their undertaking to assist the Williams family prematurely. Once the officers spoke to C-U-Out's agent, they affirmatively undertook something beyond their mere public duty of responding to the 911 call. This duty could then be breached by an omission. See *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 272, 130 P.3d 555 (2006) (elements of negligence are [1] existence of duty, [2] act or omission in breach of duty).

On this record, given our responsibility to credit the amended petition's factual allegations and examine whether they support a cause of action under any theory, we hold that dismissal on the ground that plaintiffs would never be able to show that the officers and the City owed them an individual duty was error. The amended petition was sufficient to support the existence of a police and City duty under Restatement (Second) of Torts § 323. See also *Daubenspeck v. Com.*, 894 A.2d 867, 871 (Pa. Commw. Ct. 2006) ("In order to prove a special relationship, a party must establish that the governmental entity was aware of the individual's situation or unique status, had knowledge of the potential for the harm the individual suffered, and voluntarily assumed, because of this knowledge, to protect the individual from the harm which occurred.").

*KTCA Discretionary Function Immunity*

Having disposed of the duty question in the plaintiffs' favor, we turn to the plaintiffs' second challenge to the Court of Appeals panel's opinion: Were the officers, and thus, the City, nevertheless immune from liability under the KTCA?

Whether "a governmental entity is immune from liability under an immunity exception of the [KTCA] is a matter of law. Accordingly, appellate review is de novo."

24

*Soto v. City of Bonner Springs*, 291 Kan. 73, Syl. ¶ 4, 238 P.3d 278 (2010); see also *Patterson v. Cowley County*, *Kansas*, 307 Kan. 616, 630, 413 P.3d 432 (2018).

Historically, sovereign immunity exempted governmental entities and their officers from privately instituted civil suits without the expressed consent of the sovereign. See *Collins v. Heavener Properties, Inc.*, 245 Kan. 623, 628, 783 P.2d 883 (1989) (discussing historical origin of sovereign immunity). With the adoption of the KTCA in 1979, the Legislature generally abolished sovereign immunity with respect to tort claims.

> "Liability is the rule, and immunity is the exception for governmental entities sued under the KTCA. [Citation omitted.] The general rule of liability is established by K.S.A. 2015 Supp. 75-6103(a)[,] which provides:
>
>> 'Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.'" *Keiswetter v. State*, 304 Kan. 362, 366, 373 P.3d 803 (2016).

Despite this general rule, the KTCA also provides exceptions that establish when a governmental entity or employee is not liable for damages. See K.S.A. 2018 Supp. 75-6104. "A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from" the exercise of certain enumerated functions. See K.S.A. 2018 Supp. 75-6104(a)-(x). In addition, the enumeration of exceptions to liability "shall not be construed to be exclusive nor as legislative intent to waive immunity from liability in the performance or failure to perform any other act or function of a discretionary nature." K.S.A. 2018 Supp. 75-6104.

25

When the district judge granted the City's motion to dismiss, he did not explicitly cite to any specific statutory exception, instead referring to immunity "in the performance of [the officers'] discretionary functions." In its brief to the Court of Appeals, the City explicitly invoked subsection (e) of K.S.A. 75-6104, which immunizes government actors and entities from liability for

"any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 2018 Supp. 75-6104.

As this is the only immunity provision invoked by the City on appeal, it is the only one with which we concern ourselves.

In *Robertson*, an early KTCA case, this court addressed a district judge's dismissal of a lawsuit against the City of Topeka based on the KTCA discretionary function exception. As the district judge noted when dismissing this lawsuit, the *Robertson* opinion stated: "Even with the advent of notice pleading, it is incumbent upon a person asserting a claim against a public officer to make at least some allegation which, if true, would tend to establish that immunity was not a bar to the claim." *Robertson*, 231 Kan. at 359 (citing *Hendrix v. City of Topeka*, 231 Kan. 113, Syl. ¶ 5, 643 P.2d 129 [1982]). But we have recently held that a "governmental entity bears the burden to establish immunity under the exceptions of the Kansas Tort Claims Act." *Soto*, 291 Kan. 73, Syl. ¶ 5.

Regardless, at this stage in this particular case, we are required to rely entirely on plaintiffs' amended petition to determine whether the City is certainly immune from liability. Multiple factors go into determining whether a function or a duty is discretionary.

26

"'Kansas courts look foremost to the nature and quality of the discretion exercised.' Further, '[t]he mere application of any judgment is not the hallmark of the exception.' But '[t]he more a judgment involves the making of policy[,] the more it is of a "nature and quality" to be recognized as inappropriate for judicial review.' The necessity that the actor employ expertise, whether educational or experiential, also is relevant to determining whether an action is discretionary or ministerial. See *Allen*[ *v. Kansas Dept. of S.R.S.*], 240 Kan. [620,] 623, [731 P.2d 314 (1987)] (employee's action not discretionary when decision on how to clean vomit from floor did 'not invol[ve] any particular skill or training'). Negligent performance of a ministerial act is not within the protective orbit of the discretionary function exception. [Citations omitted.]" *Thomas*, 293 Kan. at 234-35.

In *Robertson*, this court held that police officers were entitled to discretionary function immunity for how they responded to a call from the plaintiff requesting that a third party be removed from property. As the *Robertson* court summarized,

"Plaintiff advised the officers that [the third-party] had no right to be on the property, that he was intoxicated, and that he would most likely burn the house down if he remained. The officers refused to remove [him] from the premises and directed plaintiff to leave the premises. Approximately fifteen minutes later, the house burned." *Robertson*, 231 Kan. at 358-59.

After discussing the Federal Tort Claims Act and quoting approvingly from cases interpreting the FTCA, the court held that the officers were entitled to immunity.

"In the case at bar, Topeka police officers responding to a call were allegedly negligent in refusing to remove [the third-party] from the plaintiff's property when requested to do so. . . . [T]he officers had no clear-cut remedy. They were faced with a situation in which, to keep the peace, someone had to be evicted from the property. They exercised their judgment and asked the plaintiff to leave. We believe this to be an exercise of discretion within the discretionary function exception. It would be virtually impossible for police departments to establish specific guidelines designed to anticipate every situation an officer might encounter in the course of his work. Absent such guidelines, police officers

should be vested with the necessary discretionary authority to act in a manner which they deem appropriate without the threat of potentially large tort judgments against the city, if not against the officers personally." 231 Kan. at 362.

The court's review of federal caselaw convinced it that "it is the nature and quality of the discretion exercised which should be our focus rather than the status of the employee exercising that discretion." 231 Kan. at 362. Federal courts had noted that "'[j]udgment is exercised in almost every human endeavor,' so that factor alone cannot be determinative of immunity." 231 Kan. at 361.

Kansas Professor William E. Westerbeke has written about some inconsistency in the "model" Kansas courts have used to analyze discretionary function immunity, singling out *Robertson* for cogent criticism:

> "Kansas cases also reflect the divide between the strict discretionary function limited to policy-oriented decisions and the broad discretionary function encompassing decisions that are not ministerial.
>
> . . . .
>
> " . . . [T]he pattern of decisions seems rather *ad hoc*, and occasionally an individual case will recognize one model of discretion, but then resolve the issue in a manner consistent with the other. For example, *Robertson v. City of Topeka* was the seminal case in which the court defined discretionary function as not simply a mere exercise of judgment, but rather a policy-oriented decision that the legislature intended to put beyond judicial review. . . . The court held the police conduct to be discretionary because the departmental manual did not provide a clear guideline on how police should handle the situation. In essence, despite its formal adoption of the narrow discretionary function limited to policy-oriented decisions, the court actually employed a broad discretionary function approach by relying on the absence of a mandated police procedure to justify a discretionary characterization of the police officer's conduct."

Westerbeke, *The Immunity Provisions in the Kansas Tort Claims Act: The First Twenty-Five Years*, 52 U. Kan. L. Rev. 939, 960-63 (2004).

We also note that, in some cases, this court has held that the existence of a common-law duty prevents application of the KTCA discretionary function exception. See *Nero v. Kansas State University*, 253 Kan. 567, 588, 861 P.2d 768 (1993).

In *Nero*, the plaintiff, a KSU student, had sued KSU after being sexually assaulted in a coed residence hall by another student. On appeal after summary judgment in KSU's favor, this court addressed whether KSU owed the plaintiff any duty and whether KSU was immune to liability under any exception to the KTCA. The court held that the university-student relationship did not create a duty in and of itself. 253 Kan. at 580. But on the facts of the case, KSU owed the plaintiff a duty nonetheless.

"KSU is a landlord furnishing housing to its students in competition with private landlords. It owes a duty of reasonable care to its tenants. KSU has discretion whether to furnish housing to students. Once that discretionary decision is made, the university has a duty to use reasonable care to protect its tenants. Generally, whether a landlord has breached the duty of reasonable care to a tenant is a question of fact.

. . . .

"Here, KSU knew of the [previously] alleged rape [by the other student] and had taken reasonable steps under the circumstances—*i.e.*, it removed [him] from the coed dormitory and moved him across campus and into an all-male dormitory. The university requested that [he] stay away from the coed dorm and the food service building. School was ending, and [he] was allowed to finish the semester.

"When [the other student] enrolled for intersession, KSU had the option of refusing to rent space to him. Instead, the university placed him in a coed dorm with the plaintiff, who is from a different state and presumably had no knowledge of the pending rape charge against [the other student]. [The plaintiff] knew [he] was a fellow student

29

living in the same dormitory, which may have given her a false sense of security. She ended up alone with [the other student] in a public area. Had [he] been a stranger and not living in the same dormitory, [the plaintiff] might have been more likely to protect herself by immediately leaving the area." *Nero*, 253 Kan. at 583-84.

Based on those facts, the court concluded reasonable people could disagree whether the attack was foreseeable and thus whether KSU had violated its duty of reasonable care to the plaintiff. 253 Kan. at 584-85.

Having established that KSU owed a duty, the court then turned to immunity. After discussing caselaw interpreting and applying discretionary function immunity, the court ruled that KSU was not immune from suit. "KSU exercised its discretion to build, maintain, and operate housing units. Once that discretionary decision was made, KSU had a legal duty to use reasonable care under the circumstances in protecting the occupants of the coed housing unit from foreseeable criminal conduct while in a common area." 253 Kan. at 588. In essence, when KSU crossed over from exercising its discretion in how to perform any duty owed to the public at large, it was obligated under common-law principles to exercise a duty of reasonable care the same as a private housing provider.

When we review all of our cases, we conclude that the question of whether discretionary function immunity arises is highly contextual. We are unwilling to hold that *any* exercise of discretion—no matter how minute by however low level an employee—inevitably means that immunity exists.

Here, on the facts alleged in the amended petition, officers arguably undertook an investigation of the incident that would ultimately cause the plaintiffs' damages. And the Court of Appeals panel's primary, perhaps sole, focus on the officers' failure to arrest the C-U-Out agents does not have the dispositive legal significance the panel appears to

30

attribute to it. Rather, it is the officers' broader choice to discontinue the investigation they had begun that is under scrutiny. Certainly, if the alleged crime being committed was more obvious and had more serious consequences—a lynching, for example—we would not say that the officers' exercise of discretion to cut their investigation short was "of the nature and quality which the legislature intended to put beyond judicial review." See *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 452, 912 P.2d 729 (1996). We think the situation is likewise even when the allegedly illegal conduct is less obvious and its consequences less serious. Given the facts alleged in the plaintiffs' amended petition, this lawsuit should have survived the City's motion to dismiss based on discretionary function immunity under the KTCA.

CONCLUSION

For the reasons outlined above, we reverse the Court of Appeals opinion affirming the district court and reverse the district court's grant of the City's motion to dismiss. This case is remanded to district court for further proceedings.

JOHNSON, J., not participating.
JEFFREY R. ELDER, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution, District Judge Elder was appointed to hear case No. 116,883 to fill the vacancy on the court by the retirement of Justice Johnson.